UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
HAROLD BROWNE,
ROBERT CUSH,
DWAYNE JONES and
ADOLPHUS MCLEOD

                                                 16 CV 4224 (ENV)(VMS)

                Plaintiffs,                    AMENDED COMPLAINT

     -against-

THE CITY OF NEW YORK, JOEBIAN
ORTIZ, ALFREDO SKELTON, WILLIAM
RUSSO, PETER CARRETTA, and GARY
MARCUS,                                   PLAINTIFFS DEMAND

                Defendants.          A TRIAL BY JURY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      Plaintiffs, HAROLD BROWNE, ROBERT CUSH, DWAYNE JONES and ADOLPHUS

MCLEOD,by their attorney, LONNIE HART, JR., complaining of the Defendants, respectfully

shows and alleges as follows upon information and belief:


                    PARTIES, VENUE and JURISDICTION


1.      At all times hereinafter mentioned, each of the aforementioned

         plaintiffs were adult residents of Kings County, in the State of New

         York.

2.      At all relevant times hereinafter mentioned, defendant City of New

         York("New York City"), was and is a municipal corporation duly

         organized and existing under and by virtue of the laws of the State of

         New York and acts by and through its agencies, employees and agents,

         including, but not limited to, the New York City Police Department

3. At all times hereinafter mentioned, defendant Joebian Ortiz (Tax 894360), was employed by the City of New York as a member of the NYPD, or higher, and assigned to Brooklyn South Gang Squad ("BSGS"). Defendant Ortiz is sued herein in his official and individual capacities.

4. At all times hereinafter mentioned, defendant Alfredo Skelton (Shield 29533), was employed by the City of New York as a member of the NYPD, or higher, and assigned to the Emergency Service Unit ("ESU"). Defendant Skelton is sued herein in his official and individual capacities.

5. At all relevant times hereinafter mentioned, defendant William Russo was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS"). Defendant Russo is sued herein in his official and individual capacities.

6. At all relevant times hereinafter mentioned, defendant Peter Carretta was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS"). Defendant Carretta is sued herein in his official and individual capacities.

7. At all relevant times hereinafter mentioned, defendant Gary Marcus was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS"). Defendant Marcus is sued herein in his official and individual capacities. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

8. Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq. in the Eastern District of New York, where the plaintiffs and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

9.      On May 15, 2014, during the evening hours, each of the plaintiffs was lawfully present inside, or outside and in the vicinity of a three-story private residence located at 641 East 59 Street, in Brooklyn, New York (the "Premises").

10.      On or prior to May 15, 2014, defendant Ortiz and now-retired Det. Timothy Sheridan conducted an investigation relating to the Premises.

11.      On or prior to May 15, 2014, Ortiz and/or Sheridan applied for, and obtained, a search warrant that would permit the entry into, and search of, the first floor and basement apartments at the Premises.

12.      These two units were separate apartments within the Premises, which also contained what is believed to be a duplex apartment occupying the second and third floors of the Premises.

13.      On May 15, 2014, the warrant was executed by members of the NYPD, who entered and searched both the basement and first floor units within the Premises. Members of BSGS arranged for assistance in the execution of the warrant from ESU, and as a result, members of both ESU and BSGS participated in the warrant's execution on May 15, 2014.

14.      During the evening hours of May 15, 2014, various members of the NYPD arrived at the Premises in several NYPD vehicles, immediately following which members of ESU, including Skelton, entered the premises behind shields and with guns drawn, including heavy weaponry.

15.      As the heavily armed ESU officers approached the rear of the building, where the entrance to the basement apartment was located, individuals who were present in the rear of the building heard shouts of "gun" and, unaware that the individuals approaching down a side alley were police officers, ran into the building..

16.      Upon entry, the ESU officers moved through the crowded units and immediately seized and cuffed every person they encountered inside the first floor and basement units.

17.      By the time they had concluded their search, ESU had seized and

handcuffed 13 people inside the first-floor unit and another 13 people inside the basement, bringing the total number of persons seized by the defendants to 29.

18.     During the course of their search, ESU often moved people while or after seizing and cuffing them, so that they were placed in locations within the unit other than where they were first encountered by ESU.

19.     While ESU officers were securing the Premises, the BSGS members remained outside, both in front and behind the building.

20.     Skelton and other members of the ESU made the initial entry into the Premises. As they proceeded throughout the Premises, Skelton and his colleagues seized the plaintiffs, and other civilians present inside the Premises, handcuffing them and moving them into certain rooms, where they were centralized.

21.     Once the search was concluded and Premises secured, ESU allowed the BSGS personnel to enter the Premises and take control over the 26 people handcuffed therein. ESU then left the scene.

22.     Defendant Russo, who then held the rank of Captain and was assigned to BSGS, was at the Premises during execution of the warrant and, following ESU's withdrawal, was the senior supervising BSGS officer on the scene.

23.     Defendant Carretta, who then held the rank of Lieutenant and was assigned to BSGS, was at the Premises during execution of the warrant and, following ESU's withdrawal, was the second ranking supervising officer on the scene.

24.     Defendant Marcus, who then held the rank of Sergeant and was assigned to BSGS, was at the Premises during execution of the warrant and, following ESU's withdrawal, was the third raking supervising officer on the scene.

25.     Defendant Ortiz was the predetermined "arresting officer" on the scene.

26.     Following ESU's departure, various members of the BSGS, including the individual defendants, entered the Premises, participated in, observed, or received reports about the search of the Premises conducted by BSGS.

27.     During this period of time the 26 people initially seized and handcuffed by ESU had remained inside the Premises, still cuffed and in the defendants' custody.

28.     It was at about this time that BSGS determined that 25 of the 26 people who were seized and handcuffed would be formally arrested and charged with various crimes, while one person – Aleisha Walters – was to be released without charges from the scene.

29.     These 25 individuals included plaintiffs Harold Browne, Robert Cush, Adolphus McLeod and Dwayne Jones.

30.     At no time did the defendants have probable cause to arrest any of the plaintiffs, nor was there any reasonable basis for the defendants to believe probable cause existed.

31.     None of the plaintiffs were engaged in any unlawful or suspicious activity.

32.     Although there was no legal basis to seize the plaintiffs, defendants handcuffed the plaintiffs and took them into custody.

33.     At the time of the entry, plaintiff Robert Cush was watching television on the ground floor of the premises with approximately 12 other people.

34.     Plaintiffs Harold Browne, Dwayne Jones and Adolphus McLeod were present in the basement apartment of the Premises. It should be noted there is no entrance/exit inside of the Premises which connects the first floor apartment to the basement apartment.

35.     The defendants searched the plaintiffs, or caused them to be searched. The searches yielded no evidence of guns, drugs, or any other contraband. Plaintiffs were thrown to the ground, handcuffed and arrested. Specifically, plaintiff HAROLD BROWNE was aggressively searched and fondled in a sexually inappropriate manner. An unknown police officer fondled plaintiff HAROLD BROWNE'S testicles and placed his fingers near his anus.

36.     Although there was no of any evidence of wrongdoing on the part

of the plaintiffs. Approximately 25 people were arrested inside the location. Plaintiffs were charged with felony gun and drug possession counts despite the absence of probable cause for their arrests.

37.     All of the plaintiffs were transported to Kings County Central Booking, where they were held in anticipation of arraignment.

38.     Upon information and belief, the Kings County District Attorneys Office (hereinafter KCDA) declined to prosecute several of the other persons arrested inside the Premises.

39.     While plaintiffs were in custody and placed in holding cells, defendant Joebian Ortiz, as the arresting officer, drafted certain paperwork concerning the arrest of plaintiffs HAROLD BROWNE, ROBERT CUSH, DWAYNE JONES and ADOLPHUS MCLEOD. In this paperwork, Ortiz falsely claimed, in part, that these plaintiffs had jointly possessed more than a pound of marijuana which Ortiz claimed was recovered from a living room closet in thePremises.

40.     This claim was without merit and factually inaccurate, as none of the plaintiffs had actually or constructively possessed any marijuana, because none of the plaintiffs were present in the room where the closet in which the contraband was found was located, and there was no basis for Ortiz to believe these plaintiffs possessed any marijuana.

41.     Ortiz further claimed that plaintiff Dwayne Jones also possessed a loaded and operable handgun, based on the statement he claimed was relayed to him by defendant Skelton, in which Skelton claimed to have found the handgun underneath a sweatshirt in a bedroom where plaintiff  never waslocated.

42.     These claims are without merit. As ESU entered the Premises, each person who was eventually arrested were handcuffed and moved into various rooms and surveilled by the defendants, so that they were searched in rooms and locations other than where they were when the defendants entered. This included Dwayne Jones, whom the

defendants knew was seized inside a bathroom which was nowhere near where the gun was found, Any gun that may have been recovered, was not recovered from Jones' possession, and the defendants knew this at the time Ortiz drafted the arrest paperwork.

43.     Ortiz then sent the fraudulent arrest paperwork to the KCDA in order to justify the arrests and convince the KCDA to criminally prosecute the plaintiffs.

44.     Upon information and belief, Ortiz was fully aware the KCDA relies on arresting officers like Ortiz and his brethren to provide them with accurate and truthful information, and not to leave out evidence or facts that may be favorable to those persons under arrest, or otherwise withhold information or mislead the KCDA in any way with respect to the facts and circumstances surrounding the arrest of the plaintiffs.

45.     Despite knowing this, Ortiz lied to the KCDA about where plaintiffs were found in the Premises, where the contraband was found in the Premises and the circumstances of the arrests and searches, in order to create a scenario whereupon the plaintiffs could be prosecuted.

46.     Upon information and belief, Ortiz then reiterated the false information contained in the arrest paperwork verbally to the KCDA in order to induce them to prosecute the plaintiffs.

47.     Based on the fabricated claims of marijuana possession, plaintiffs Harold Browne, Robert Cush, Dwayne Jones and Adolphus McLeod were each charged with multiple counts of marijuana possession, including at least one felony charge, under docket numbers 2014KN036219, Arrest number K14643596, Docket number 2014KN036176 and docket number 2014KN036197 respectively.

48.     Despite Ortiz's best efforts to persuade the KCDA to initiate a criminal prosecution against plaintiff Robert Cush, the KCDA eventually declined to prosecute him and he was released from custody after many more hours without being charged.

49.     Based on the false claim of gun possession, plaintiff Dwayne Jones was also charged with multiple counts of weapons possession, including at least one felony charge,

50.     As a result of these serious felony charges, many of the plaintiffs were detained at KCCB or at a Department of Corrections facility for a period of several or more days, before they were released.

51.     On May 21, 2014, all of the charges for each of the charged plaintiffs Harold Browne, Dwayne Jones and Adolphus McLeod were dismissed, and terminated in plaintiffs' favor.

52.     At no time did Ortiz take any steps to intervene in, prevent, or otherwise limit the harms caused by his false statements he had made or to limit the consequences thereof.

53.     At no time did Skelton take any steps to intervene in, prevent, or otherwise limit the harms caused by his false statements he had made or to limit the consequences thereof.

54.     At no time did the other defendants take any steps to intervene in, prevent, or otherwise limit the misconduct engaged in by Ortiz and Skelton, and/or failed to file accurate or corrective statements, or otherwise failed to report the conduct of the defendants who engaged in the misconduct described herein as required, and at no time did any of these defendants make any effort of any sort to notify the KCDA of the absence of probable cause to arrest these plaintiffs or the falsity of fabricated statements.

55.     At no time did there exist any basis to utilize any level of force against the plaintiffs, much less the force actually employed, nor could any of the defendants have reasonably believed that such force was necessary. As a result of the excessive use of force employed by the defendants, several plaintiffs suffered physical injuries.

56.     At no time prior to or during the encounter was there probable cause to arrest the plaintiffs.

57.     That at all times relevant herein, the defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's

## FIRST CAUSE OF ACTION

(Section 1983 Claim for False Arrest by All Plaintiffs Against
Individual Defendants Russo, Carretta, Marcus, and Ortiz)

58.    Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

59.    The individual defendants willfully and intentionally seized, searched, detained, and arrested the plaintiffs without probable cause, and without a reasonable basis to believe such cause existed.

60.    The named individual defendants, i.e., all but defendant Skelton, were aware of the seizure of all plaintiffs at the moment that they were occurring, yet they took no steps to intervene in the seizure in any way, nor did they take any steps to prevent the handcuffing from occurring or continuing, nor did they take any steps to limit the continuing seizure and detention of the plaintiffs in handcuffs inside of the Premises, despite the absence of any lawful basis for the initial seizure, much less said detention and arrest.

61.    Defendant Russo has acknowledged that he witnessed members of BSGS seizing the individuals, and that he was aware that they were handcuffed during and after ESU's securing of the Premises, as well as during BSGS's search of the Premises after ESU's departure.

62.    Russo, Carretta, and Marcus were the BSGS supervisors on the scene and were responsible for the actions undertaken by the BSGS members present, as well as their failures to act, including their failure to intervene in the initial and ongoing seizure and detention of the plaintiffs.

63.    Ortiz was the pre-determined arresting officer on the scene and was responsible for investigating and gathering information as to execution of the warrant,

including the identity of each person seized pursuant to the warrant seizure, an inventory of any contraband or evidence found thereat, and the locations of both each item of contraband recovered and each person seized.

64.     Each of these individual defendants knew and understood that the plaintiffs were being held in custody and each failed to take any steps of any sort to intervene in this detention or otherwise limit the ongoing unlawful seizure, despite ample opportunity to do so.

65.     The defendants further knew and understood that they could not say where within either unit of the Premises ESU had encountered any of the plaintiffs when they entered the building or whether some or all of the plaintiffs had been moved by ESU from where they had first been found prior to BSGS's later entry into the Premises.

66.     ESU, in the regular course of business, creates and maintains records in which its officers document whom they encountered during a warrant execution, the room in which each person was found, and the ESU officer who seized each individual.

67.     While ESU memorialized this precise information in this case, neither Ortiz nor the other individuals in BSGS, made any effort to determine where within the Premises each of the plaintiffs was found by ESU.

68.     The defendants lacked any basis to believe that any of the plaintiffs were ever in the same room or part of the Premises where the BSGS claim to have recovered contraband or were engaged in any criminal conduct, and, in fact, deliberately failed to make the most basic of inquiries of ESU as to the location and circumstances of each plaintiff's seizure.

69.     Instead, the defendants simply arrested each person within the Premises and then later fabricated evidence to justify each person's arrest and to otherwise seek their prosecution.

70.     The municipal defendant and Ortiz have affirmatively admitted that the decision to arrest each of the plaintiffs was made solely by Ortiz and then verified by his

Sergeant Gary Marcus. For his part, William Russo, the senior supervisory officer on the

scene has since challenged the defendants' earlier admission, stating that he personally

made the decision to arrest each of the plaintiffs, and the remaining individuals, after

consulting with defendants Carretta and Marcus.

71.     In any event, these defendants personally participated in the decision to

arrest each of the plaintiffs, and, as there was no probable cause for these arrests, or any

reasonable basis to believe such cause existed, the individual defendants, individually and

collectively, subjected the plaintiffs to false arrest and imprisonment, and thereby violated and

aided and abetted in the violation of the plaintiffs' rights under the Fourth Amendment of the

United States Constitution.

72.     At no time did any of the individual defendants make any reasonable attempt to

intervene in the unconstitutional conduct of their fellow officers, and thus further facilitated

and tacitly encouraged the continuation of the misconduct.

73.     By reason thereof, the individual defendants have violated  42 U.S.C.

§1983 and caused each of the plaintiffs to suffer emotional and physical injuries, mental

anguish, incarceration and the deprivation of liberty, and the loss of their constitutional

rights.

<u>SECOND CAUSE OF ACTION</u>

(Section 1983 Claim for Malicious Prosecution and Denial of a Fair Trial by
Plaintiffs Harold Browne, Robert Cush, Adolphus McLeod and Dwayne
Jones Against Individual Defendants Russo, Carretta, Marcus, and Ortiz)

74.     Plaintiffs repeat the allegations contained in the preceding paragraphs above

as though stated fully herein.

75.     The defendants fabricated evidence through the false statements of Ortiz

with respect to the claims that the plaintiffs were in possession of various items of

contraband or otherwise engaged in criminal conduct, and forwarded these fabrications to

the KCDA for the purpose of initiating and continuing the plaintiffs' prosecution.

76.     As a result of defendants' fabrications, omissions, and materially misleading

and factually inaccurate representations to the KCDA, criminal prosecutions were initiated against these plaintiffs, or DATs otherwise issued, resulting in the deprivation of the plaintiffs' liberty, including post-arraignment jailing of several of the plaintiffs for a period of days.

77.     Moreover, the defendants further caused the plaintiffs to be maliciously prosecuted by knowingly subjecting them to criminal process without probable cause.

78.     To the extent that any of the individual defendants did not personally participate in the fabrication of evidence or communications about said evidence with the KCDA, these individual defendants were aware that the arrests were made without probable cause, and were equally aware that Ortiz and/or other officers fabricated evidence or communicated a materially misleading or falsified version of the facts to the KCDA, and, despite ample opportunity to do so, failed to intervene in the unconstitutional conduct of their fellow officers, and thus further facilitated and encouraged the continuation of the misconduct.

79.     By so doing, the individual defendants, individually and collectively, subjected the plaintiffs to the denial of a fair trial and malicious prosecution, and thereby violated and aided and abetted in the violation of the plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

80.     By reason thereof, the individual defendants have violated  42 U.S.C. §1983 and caused the plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.


THIRD CAUSE OF ACTION

(Section 1983 Monell Claim by All Plaintiffs Against the Municipal Defendant)


81.     Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

82.     Defendant City of New York was responsible for ensuring that reasonable and appropriate levels of supervision were in place within and/or over the NYPD.

83.     Ortiz's actions in this matter – condoned by and carried out with the approval of

the other defendants – were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

84.     The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

85.     Ortiz and members of his BSGS had a demonstrated history of making wholesale arrests of all persons found inside of apartments or homes while executing search warrants, without probable cause to make such arrests, as the municipal defendant was well aware.

86.     For instance, on April 13, 2011, Ortiz, along with his then-partner Timothy Sheridan, and accompanied by defendant Carretta and other members of the BSGS, entered a home on East 56 Street in Brooklyn, New York, and arrested numerous individuals on falsified claims that they all possessed marijuana or a stun gun or other contraband. These charges were later dismissed and resulted in numerous lawsuits, including the following EDNY actions brought by 16 of the falsely arrested individuals: Nelson, et al., v. City of New York, et al., 12 CV 519 (KAM) (JMA), Turner v. City of New York, et al., 13 CV 3705 (ARR) (LB), Mojica, et al., v. City of New York, et al., 14 CV 2399 (PKC) (RER), Dewar, et al, v. City of New York, et al., 14 CV 2400 (PKC) (RER), Laguerre v. City of New York, et al., 14 CV 2409 (PKC) (RER), Bryant v. City of New York, et al., 14 CV 2410 (PKC) (RER), which were settled for a total amount of $315,000.

87.     The above actions represent but a small fraction of the lawsuits filed against Ortiz and other members of his BSGS team, of which Carretta was a long time supervisor, and which reflect the unit's proclivity for making warrantless arrests during search warrant executions.

88.     In addition, members of the Gang Division were, at all relevant times herein, evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the Gang Division routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

89.     The NYPD generally, and BSGS in particular, tracks the number of arrests made by each officer but does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, members of the Gang Division are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to criminal prosecutions, much less convictions.

90.     More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

91.     Upon information, this policy was in existence as of April 4, 2014, as codified in an October 17, 2011, Police Officer Performance Objectives Operation Order in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

92.     Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage in proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

93.     In the case of Floyd v City of New York, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in Floyd, included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, and a labor grievance on behalf of six officers and one sergeant who were transferred out of the same 75

precinct where plaintiff was arrested for allegedly failing to meet a monthly ten-summons quota. In January 2006, a labor arbitrator found that this same 75 precinct had imposed summons quotas on its officers in violation of New York State labor laws.

94.     In another Southern District of New York case, Schoolcraft v. City of New York, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas, and explicitly directed officers to "arrest and summons fully innocent people" and then come up with a justification later.

95.     In 2012, Police Officer Craig Matthews commenced Matthews v. City of New York, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, and thereby causing damage to the department's relationship with the local community led to his termination. There was little dispute that he made these complaints or that they were well founded. See Matthews v. City of New York, 779 F.3d 167, 169 (2d Cir. 2015).

96.     That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

97.     The policy or plan was kept in effect through the date of plaintiffs' arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

98.     In this case, even if the individual defendants did recover contraband, they engaged in mass arrests of plaintiffs without probable cause as part and parcel of this policy designed to boost their productivity numbers, and then fabricated evidence to attempt to justify the arrests and promote the initiation of the plaintiffs' prosecution.

99.   At no time did any of the individual defendants make any reasonable attempt to intervene in the unconstitutional conduct of their fellow officers, and thus further facilitated and tacitly encouraged the continuation of the misconduct, and thereby confirmed the existence of this policy.

100.   By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused the plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiffs demand judgment against defendants jointly and severally as follows:

i.   on the first and second cause of action, actual and punitive damages in an amount to be determined at trial;

ii.   on the third cause of action, actual damages in an amount to be determined at trial;

iii.   statutory attorney's fees pursuant to, inter alia, 42 U.S.C. §1988 and New York common law, disbursements, and costs of this action; and

iv.   such other relief as the Court deems just and proper.

Dated: Brooklyn, New York
March 28, 2017

LONNIE HART JR. P.C.
Attorneys for Plaintiffs

By:   Lonnie Hart Jr., Esq.
26 Court Street, Suite 714
Brooklyn, New York 11242
(718)246-8200
LH3560